<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

C. TATE GEORGE,

     Petitioner,

   v.

UNITED STATES OF AMERICA,

     Respondent.

Civ. No. 17-2641

**OPINION**

<u>THOMPSON, U.S.D.J.</u>

## **INTRODUCTION**

Before the Court is Petitioner's second amended motion to vacate, correct, or set aside his federal sentence pursuant to 28 U.S.C. § 2255 ("Instant Motion"). (ECF No. 25). Respondent filed an opposition, (ECF No. 44), and Petitioner filed a reply, (ECF No. 48). For the reasons stated herein, the Court will deny the Instant Motion and no certificate of appealability shall issue. Additionally, the Court will deny as moot Petitioner's three motions to expedite, (ECF Nos. 40, 59, 64), deny his motion for an evidentiary hearing, (ECF No. 47), and deny as futile his motion to amend, (ECF No. 54).

## **BACKGROUND**

This case arises from a Ponzi scheme involving Petitioner and his company, The George Group, LLC. From 2005 through 2011, Petitioner raised millions of dollars from investors by misrepresenting his portfolio and activities and falsely representing that he would use their funds for certain real estate development projects.

Instead of using the funds as described, Petitioner spent the vast majority of the funds on

personal expenses and on Ponzi scheme style payments to previous victims. Petitioner's "fraud was exposed when he became unable to make required payments and failed to pursue most of the projects he had promised." *United States v. George*, 684 F. App'x 223, 225 (2017).

On March 23, 2012, a Grand Jury indicted Petitioner on four counts of wire fraud in violation of 18 U.S.C. § 1343, and trial began on September 9, 2013. (Crim. No. 12-204, ECF Nos. 14, 56).  The Honorable Mary L. Cooper, U.S.D.J., presided over the trial. On September 30, 2013, a jury convicted Petitioner on all counts. (Crim. No. 12-204, ECF No. 82). Appointed counsel, David E. Schafer, Esq., represented Petitioner throughout the trial.

Approximately one year later, Petitioner dismissed Mr. Schafer, and retained Andrew T. McDonald, Esq., in September of 2014. (Crim. No. 12-204, ECF No. 105). After the Court denied Petitioner's motion for a new trial and other post-trial motions in November of 2014, the Court issued an Order to Show Cause as to why it should not disqualify Mr. McDonald because he appeared to have "a physical and/or mental condition that materially impair[ed]" his ability to represent Petitioner. (Crim. No. 12-204, ECF No. 124).

At this point, the Court had not yet sentenced Petitioner, and instead of accepting appointed counsel, Petitioner requested to proceed *pro se*. Consequently, on December 3, 2014, the Court held a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975). (Crim. No. 12-204, ECF No. 147).

At his *Faretta* hearing, the Court advised Petitioner of the extremely limited role of standby counsel and that he would be foregoing the ability to later complain that he was denied effective counsel, that standby counsel was ineffective, or that Petitioner's counseling of himself was ineffective. (*Id*. at 9, 66). At the conclusion of the hearing, the Court found that Petitioner knowingly and voluntarily waived his right to counsel and appointed John A. Azzarello, Esq., as

2

standby counsel. (*Id*. at 97–99).

During the approximately two-year sentencing process, Petitioner requested a forensic accounting report "to verify any money loss for proper sentencing by the judge," and requested $15,000.00 in expenses. (Crim. No. 12-204, ECF No. 211, at 105). The Court granted that request, and Petitioner retained Joseph B. Matheson, to complete the forensic report ("Matheson Report"). (*Id*.). According to Petitioner, the Matheson Report proved that there were no victim losses, that there was no fraud, and that all expenses from his company were legitimate.

The Court then held a sentencing hearing over six days. Because the Matheson Report is central to some of Petitioner's claims, the Court recites its relevant findings with regard to that report:

> At the sentencing hearing Mr. Matheson said that he stands by his report, which concludes that *based upon the government's charts*, the government's charts show no crime and no loss to any of the asserted victim individuals.
>
> On cross-examination by the government he acknowledged that he did read the contracts with these victims, yet he relied on the pro formas budget documents related to the projects, rather than the contracts. *He also admitted that he did not read the trial testimony of anybody before issuing his report.* He acknowledged that just because someone has a legitimate business, the business can still be used to commit fraud.
>
> And he said he relied on the defendant's representations about what individuals were involved in which of the listed real estate projects that are on his list. He did not even review the trial testimony of defendant at trial, which, of course, was rejected by the jury in convicting him . . . .
>
> He did not read the trial testimony of the five trial victims, whose names he was asked by the defendant to consider. This would be exclusive of Ramsey and Taylor because the defendant didn't ask him, Matheson, to review those trial victims. And when the defendant -- he said *he relied on the defendant's word that . . . those five victims, namely, Mellinger, Knight, Fauntleroy, Pinkett, and Villanueva agreed to roll their investments into other projects*, and

he only saw one renewed contract or redo contract; that would be by Louis Mellinger. He didn't even read those victims' trial testimony, including that of Louis Mellinger.

He defined "loss" for his purposes as money spent not in accordance with the pro formas for the projects, but he did not know, he said, whether the five listed victims covered by his report ever even saw those pro formas.

He concluded that in adding the fees stated in the pro formas and comparing that to what defendant spent that was his basis for saying there was no losses shown to the victims. When asked would it make sense for him as an accountant to review some of the other information from the trial, not just the one day's worth of charts that the government presented before coming to any conclusion for his report, *he said he was only asked by defendant to look at those charts*[.].

What Mr. Matheson did in his report and in his testimony at this sentencing hearing was . . . *to take a very, very limited snapshot view of only the government's charts*. His testimony has no bearing and no fit with all of the rest of the evidence that was presented by the prosecution at trial. He didn't even read any of that evidence. Now, his response was, well, I was under a limited budget . . . . Well, if he had had a limited budget and could not even review the evidence of the trial, he should not have undertaken . . . to provide a forensic accounting when *at the end of the day he provided no forensic accounting whatsoever*.

Indeed, he offered unsubstantiated personal opinions not even directed at the stated purpose of the assignment. Rather, he criticized the government for not having done a forensic accounting before trial and said in his experience that should always be done. Well, his experience is less than a net opinion in the view of this Court because he is not a prosecutor. He certainly is no judge of the law, and he is certainly no experienced professional in what it takes to present or to prove a criminal fraud case in federal court.

So the fit is absolutely lacking. He does not have the expertise to opine on the adequacy of the Government's proofs, and he utterly failed to render any forensic accounting, which is what he was hired to do. So, therefore, unfortunately, we find that his opinions are wholly unreliable, useless, and we regret the expenditure of CJA funds for this pointless exercise.

(Crim. No. 12-204, ECF No. 211, at 111–16 (emphasis added)).

At the hearing, the Court also found that the total loss to the victims was $2,550,507.28 and applied a 20-level enhancement for victim hardship and financial loss. Additionally, because Petitioner testified and adamantly misrepresented his authority to use the investors' money, the Court found that his statements were "irreconcilably. . . at odds with what the jury necessarily found in the verdict." (Crim. No. 12-204, ECF No. 212, at 28–29). As a result, the Court applied a 2-level enhancement for Petitioner's perjuries. *Id*. Ultimately, the Court sentenced Petitioner to 108 months in prison, followed by three years of supervised release, and restitution in the amount of $2,550,507.28.

Petitioner appealed, claiming among other things, that: (1) "the 2-level enhancement for perjury was unjustified and the 20-level enhancement for victim hardship and financial loss was unsupported by the evidence;" (2) that the Government violated *Brady* by providing unreadable disks; and (3) that the Government suborned numerous perjuries. *See George*, 684 F. App'x. at 225–27. The Third Circuit rejected each of Petitioner's claims and affirmed the sentence. *Id*. at 228.

On April 18, 2017, Petitioner filed his initial motion to vacate, set aside, or correct his sentence under § 2255. (ECF No. 1). The Court terminated that motion and directed Petitioner to resubmit his motion on the proper form. (ECF No. 2). Petitioner filed his first amended § 2255 motion on the proper form in July of 2017. (ECF No. 7).

Thereafter, Petitioner filed numerous requests to amend his § 2255 motion, and in October of 2017, the Court directed Petitioner to file a proper motion to amend, along with a proposed amended pleading. (ECF Nos. 18, 19, 23, 24). In November of 2017, Petitioner filed the Instant Motion. (ECF No. 25).

In the Instant Motion, Petitioner generally contends that counsel was ineffective for: (1)

5

failing to order a forensic accounting report prior to trial; (2) failing to properly identify factual and legal issues; (3) failing to prepare and secure trial evidence; and (4) failing to investigate or call various witnesses. (*Id.*). Respondent filed an opposition, (ECF No. 44), and Petitioner filed a reply, (ECF No. 48). Additionally, Petitioner filed three motions to expedite, (ECF Nos. 40, 59, 64), a motion for an evidentiary hearing, (ECF No. 47), and a motion to amend, (ECF No. 54).

## LEGAL STANDARD

Section 2255 provides in relevant part that:

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). A district court must hold an evidentiary hearing on a § 2255 motion unless the "motion and the files and records of the case conclusively show" that the movant is not entitled to relief. 28 U.S.C. § 2255(b); *see also United States v. Booth*, 432 F.3d 542, 545–46 (3d Cir. 2005). Here, the record conclusively demonstrates that Petitioner is not entitled to relief.

## DISCUSSION

I.    **Improperly Raised Arguments**

Before turning to the merits of this case, the Court must address two types of improper arguments within Petitioner's reply. First, Petitioner contends that the Government "conceded" some claims, because the Government did not respond to certain claims within Petitioner's earlier § 2255 motions or other miscellaneous filings. Broadly, those claims *directly*[1] challenge

---

[1] To the extent Petitioner contends that counsel was ineffective related to sentencing, the Court will address those claims below.

Petitioner's 20-level sentencing enhancement for victim hardship and financial loss and 2-level enhancement for perjury. (ECF No. 48, at 14, 27).

In Petitioner's words, he "has filed multiple motions to amend," throughout this case, (ECF No. 48, at 3), and in November of 2017, the Court granted Petitioner leave to amend. (ECF Nos. 23, 24). In both Petitioner's first proper[2] § 2255 motion and the Instant Motion, Petitioner executed *Miller* notices that advised him that he must include *all* of his claims and the facts supporting each claim, in one § 2255 motion. (ECF No. 7, at 14; ECF No. 25, at 16); *see United States v. Miller*, 197 F.3d 644, 649 (3d Cir. 1999) (holding that to avoid the statute's procedural bars, "petitioners must marshal in one § 2255 writ all the arguments they have to collaterally attack their convictions.").

An amended § 2255 motion, once filed, "completely replaces the original" and a party must "include all his claims in the amended" motion. *See, e.g.*, *Bethea v. Bickell*, No. 13-1694, 2015 WL 1608521, at *1–2 (M.D. Pa. Apr. 10, 2015); *Richardson v. Piazza*, No. 07-2065, 2008 WL 7425718, at *2 (E.D. Pa. Dec. 30, 2008) ("An amended habeas petition which makes no

---

[2] Petitioner claimed that the form of his original motion, (ECF No. 1), "was exactly the same as the proper form" and complained of the delay due to "the [C]ourt's own error." (ECF No. 7-1, at 1). Unlike Petitioner's original motion, however, the proper form has a *Miller* notice on the final page, which states:

> I declare (or certify, verify, or state) under penalty of perjury that I have been notified that I must include in this motion all the grounds for relief from the conviction or sentence that I challenge, and that I must state the facts that support each ground. I also understand that if I fail to set forth all the grounds in this motion, I may be barred from presenting additional grounds at a later date.

(ECF No. 7, at 14; ECF No. 25, at 16).

reference to the original . . . and does not incorporate it into the amended petition replaces the original habeas petition.").

Petitioner could have easily restated his direct challenges, or incorporated them by reference, but did not do so within the Instant Motion. (*See* ECF No. 25). As a result, the Government had no cause to respond to such claims.

Accordingly, such claims are not properly before the Court, and the Court declines to consider Petitioner's direct challenges to his sentencing enhancements.[3] *See, e.g.*, *Soto v. United States*, No. 04-2108 , 2005 WL 3078177, at *6 (D.N.J. Nov. 16, 2005), *aff'd*, 313 F. App'x 496 (3d Cir. 2008).

Turning then to the second type of improper claim, Petitioner attempts to raise several ineffective assistance of counsel claims for the first time in his reply brief. Such claims include: (1) that the Government suborned perjury and trial counsel had evidence to refute it; and (2) that trial counsel should have called, investigated, or impeached, at least nine new witnesses. (ECF No. 48). In fact, with the exception of Ralph Ramsey, the Instant Motion fails to identify any witnesses. (ECF No. 25).

Under our jurisprudence, a party "may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *See, e.g.*, *Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015) (declining to consider ineffective assistance of counsel claims as to two additional witnesses raised for the first time in a reply brief); *see also*

_____

[3] As discussed below, the Court alternatively declines to consider these claims because the Third Circuit has already rejected Petitioner's challenges to his sentencing enhancements. *See United States v. DeRewal*, 10 F.3d 100, 105 (3d Cir. 1993) (finding that petitioners may not utilize § 2255 "to relitigate questions which were raised and considered on direct appeal.")

*McNeil v. Johnson*, No. 18-10003, 2019 WL 3805118, at *1 (D.N.J. Aug. 12, 2019); *Soto*, 2005 WL 3078177, at *6.

This prohibition applies in habeas matters because "[b]asic fairness requires that an opposing party have a fair notice of his adversary's claims, as well as an opportunity to address those claims." *McNeil*, 2019 WL 3805118, at *1 (quoting *Judge*, 119 F. Supp. 3d at 284). "The reason for such a rule is clear: it would be fundamentally unfair to the Government to permit Petitioner to provide the true bases for his claims after the Government has used its only opportunity to respond by answering [Petitioner's] barebones motion." *Gilbert v. United States*, No. 14-243, 2016 WL 4087274, at *4 (D.N.J. July 28, 2016). Furthermore, the prohibition is "especially applicable" in situations where a petitioner "was advised, and certified that he is aware, that he was required to raise all of his claims in a single habeas" motion. *Id.*

With those principles in mind, Petitioner raised his claims regarding the alleged failures to refute perjury and failures to call, investigate,[4] or impeach, Mr. Knight, Charles Houlihan, Kenneth Atkins, Naiima Fauntleroy, Mr. Pinket, Mr. Mellinger, Sean McNamee, Michael Hubbard, and Sean Mack, for the first time in his reply brief. (*See* ECF No. 48). "Because Petitioner's reply is largely made up of arguments and alleged facts which were not" within the Instant Motion, the Court is "well within the bounds of propriety to refuse to consider the arguments contained in the reply." *See, e.g.*, *Gilbert*, 2016 WL 4087274, at *4.

---

[4] With the exception of Mr. Atkins, as discussed in greater detail below, the Court would also deny the witness claims for failure to include sworn statements from these individuals. *See, e.g.*, *Ali v. Nogan*, No. 13-7364, 2016 WL 8678443, at *7 (D.N.J. Apr. 1, 2016) (citing *Duncan v. Morton*, 256 F.3d 189, 201–02 (3d Cir. 2001)) (holding that the "failure to include a sworn statement regarding the nature of this witness's proposed testimony is fatal" to the showing of a *prima facie* case of prejudice under *Strickland*).

9

The "prohibition against raising new arguments in a reply is not unfair" to Petitioner, who received an opportunity to amend, and received, on two separate occasions, "a *Miller* notice advising him that all claims must be presented in one § 2255 motion." *Sellers v. United States*, No. 14-388, 2017 WL 434209, at *6 (D.N.J. Jan. 31, 2017). Indeed, Petitioner declared, under penalty of perjury, that he "must include in this motion all the grounds for relief from the conviction or sentence, . . . [and] state the facts that support each ground" and that he understood that if he failed to do so, he "may be barred from presenting additional grounds at a later date." (ECF No. 25, at 16).

In light of these facts, the Court declines to address the new claims within Petitioner's reply brief. *See, e.g.*, *McNeil v. Johnson*, No. 18-10003, 2019 WL 1650283, at *12 (D.N.J. Apr. 17, 2019) (citing *Judge*, 119 F. Supp. 3d at 284); *Soto*, 2005 WL 3078177, at *6 (finding that the "Court does not believe it is necessary to expend time and resources on … [positions] that Petitioner neglected to address in his § 2255 petition.").

## II.     Standby Counsel and Sentencing Related Claims

Additionally, the Court must address another preliminary matter to properly frame Petitioner's ineffective assistance of counsel claims. In his filings, Petitioner seeks to challenge the actions of his attorneys both at trial and throughout the sentencing process. After trial, however, Petitioner moved to proceed *pro se*. Consequently, on December 3, 2014, the Court held a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), and appointed John A. Azzarello, Esq., as standby counsel. (Crim. No. 12-204, ECF No. 147). Petitioner proceeded *pro se* from that point thereafter, throughout the entire sentencing process, which concluded on January 21, 2016.

Under our jurisprudence, "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta*, 422 U.S. at 834 n.46; *Southerland v. Nogan*, No. 18-9469, 2019 WL 1379883, at *9 (D.N.J. Mar. 26, 2019). Nor can one claim ineffectiveness of standby counsel, because there is "no constitutional right to standby counsel." *See United States v. Tilley*, 326 F. App'x 96, 96–97 (3d Cir. 2009); *Clifton-Short v. Johnson*, No. 17-6193, 2019 WL 4635799, at *4 n.2 (D.N.J. Sept. 24, 2019).

At his *Faretta* hearing, the Court advised Petitioner of the extremely limited role of standby counsel and that he would be foregoing the ability to later complain that he was denied effective counsel, that standby counsel was ineffective, or that Petitioner's counseling of himself was ineffective. (Crim. No. 12-204, ECF No. 147, at 9, 66). At the conclusion of the hearing, the Court found that Petitioner knowingly and voluntarily waived his right to counsel.

Consequently, Petitioner waived "any and all claims of ineffective assistance of counsel" as to any events after "he chose to proceed *pro se*." *Southerland*, 2019 WL 1379883, at *9 (citing *Faretta*, 422 U.S. at 834 n.46). Such events include the entire six-day sentencing hearing.

Accordingly, to the extent Petitioner claims that Standby Counsel was ineffective at the sentencing hearing, or that Petitioner was otherwise denied effective counsel at sentencing, the Court denies those claims.

## III.   Ineffective Assistance of Counsel Claims

Turning then to the merits of the Instant Motion, Petitioner raises four grounds for relief that overlap at times. The Court will construe the arguments to be that counsel was ineffective for: (1) failing to order a forensic accounting report prior to trial; (2) failing to properly identify factual and legal issues; (3) failing to prepare and secure trial evidence; and (4) failing to

11

investigate or call various witnesses.

A petitioner seeking to show that his counsel was constitutionally ineffective must meet a "highly demanding" standard. *Lockhard v. Fretwell*, 506 U.S. 364, 378 (1993). To prevail on a claim of ineffective assistance of counsel, a petitioner must show: 1) his counsel's performance fell below an objective standard of reasonable professional assistance; and 2) that counsel's deficient performance prejudiced the defense, meaning there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984). A judge's scrutiny of an attorney's performance is "highly deferential" and the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

A court need not address both components of the ineffective assistance inquiry. *Id.* at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice" courts should follow that course. *Id.*

A.    *Ineffective Assistance of Counsel for Failure to Order a Forensic Accounting Report Prior to Trial*

First, Petitioner contends that Trial Counsel was ineffective for failing to order a forensic accounting report, like the Matheson Report, prior to trial. In Petitioner's view, the Matheson Report would have "easily showed that all projects existed, there was no fraudulent activity[,] and no monies were spent outside of normal business practices." (ECF No. 25, at 5).

This Court, however, found the report "wholly unreliable, useless, and . . . [a] pointless exercise." (Crim. No. 12-204, ECF No. 211, at 111–16). "What Mr. Matheson did in his report . . . . [was] to take a *very, very limited snapshot view of only the government's charts*." (*Id*. at 115 (emphasis added))). Mr. Matheson "admitted that he did not read the trial testimony of anybody

before issuing his report," including the testimony of Petitioner or the five trial victims he was asked to consider (*Id.*).

Instead, Mr. Matheson composed his report by relying on Petitioner's representations "about what individuals were involved in which of the listed real estate projects" and on the "pro formas budget documents related to the projects, rather than the" actual contracts with the victims. (*Id.* at 112).

Mr. Matheson, "relied on the [Petitioner's] word that . . . those five victims, namely, Mellinger, Knight, Fauntleroy, Pinkett, and Villanueva agreed to roll their investments into other projects," but only saw one renewed contract that involved Mr. Mellinger. (*Id.* at 112–13). Once again, however, the jury necessarily rejected Petitioner's version of the events, in convicting the Petitioner. (*Id.* at 131–32).

In any event, Mr. Matheson did not read the victims' trial testimony, and only defined "'loss' for his purposes as money spent not in accordance with the pro formas for the projects." (*Id.* at 113). He did not know whether those five victims, "ever even saw those pro formas." *Id.*

Astoundingly, when asked if it would "make sense for him as an accountant to review some of the other information from the trial, not just the one day's worth of charts that the government presented before coming to any" conclusions, he responded that "*he was only asked by defendant to look at those charts*." (*Id.* (emphasis added)).

Ultimately, as the Court found, and the Third Circuit agreed, the report would not have been admissible at trial because it "utterly failed to render any forensic accounting." *George*, 684 F. App'x at 227 (quoting (Crim. No. 12-204, ECF No. 211, at 116)); *see also* (Crim. No. 12-204, ECF No. 189 ("The report of Mr. Matheson . . . is certainly not admissible in evidence")).

Even if the report were admissible, it "would not have been admissible at trial without

testimony of an accountant," and Mr. Matheson would be subject to the same cross-examination discussed above, which revealed his report to be "wholly unreliable, useless," and to have "provided no forensic accounting whatsoever." (Crim. No. 12-204, ECF No. 211, at 116; ECF No. 189, at 119). For all of those reasons, Petitioner has failed to demonstrate that Trial Counsel performed deficiently in refusing to order the Matheson Report prior to trial.

Similarly, Petitioner fails to meet the prejudice prong of *Strickland*. At the outset, Petitioner makes no effort to address the inadmissibility of the Matheson Report. *George*, 684 F. App'x at 227. Nor does Petitioner explain how an inadmissible report could have changed "the result of the proceeding." *Strickland*, 466 U.S. at 694.

Even if the report were admissible, for the reasons discussed above, it would have been revealed as wholly unreliable, because it took an extremely limited snapshot of the total evidence and relied on Petitioner's misrepresentations. (Crim. No. 12-204, ECF No. 211, at 111–16).

Indeed, as the Third Circuit held, the report "simply restates previously available information by summarizing George's (disproven) contentions at trial." *George*, 684 F. App'x at 227. The report merely "attempts to sum up . . . what Mr. George would have wanted the jury to believe from his point of view." *Id*. (quoting (Crim. No. 12-204, ECF No. 189, at 122)). "*The report does not prove an absence of victims or fraud*, as he claims; rather, it summarizes his previous contentions to that effect." *Id*. (emphasis added).

Once again, however, the jury rejected Petitioner's version of the events. As this Court summarized:

> Even though the defendant said[,] I advised all these individuals that the original deal that they took so much painstaking time to decide to invest in went south, and I told them what I had done with their money, spending it on my personal expenses instead of the deals, they agreed to roll their money over into these new deals, which the trial victims had no idea about. That was the say-so of the defendant,

14

> and the jury rejected that.
>
> That was the total opposite of what the trial victims testified to. They said that never happened. There were never any oral modifications to their agreements. So indeed, necessarily implicit in the verdict of the jury is that the defendant lied on the stand.

(Crim. No. 12-204, ECF No. 211, at 131–32).

Because the Matheson Report would not have been admissible, does not prove an absence of victims or fraud, and is based on disproven contentions, Petitioner has not established prejudice under *Strickland*. Stated differently, even assuming that Trial Counsel was deficient, Petitioner fails to establish a reasonable probability that, but for that error, the result of the trial would have been different.

Additionally, to the extent Petitioner may be contending that counsel should have ordered a different forensic report from a different expert, the Court rejects that claim. Petitioner "neither names the expert that should have been called, nor provides any affidavit" from that unspecified expert. *See, e.g.*, *Santiago v. Superintendent of SCI Huntingdon*, No. 15-5868, 2016 WL 7634790, at *8 (E.D. Pa. Oct. 31, 2016). Petitioner cannot meet his burden "based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense." *See Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 (3d Cir. 1991).

The failure to identify a witness and secure a sworn statement from that witness is "fatal" to the making of a "prima facie showing of prejudice" under *Strickland*. *See, e.g.*, *Tolentino v. United States*, No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014) (citing *Duncan v. Morton*, 256 F.3d 189, 201–02 (3d Cir. 2001)). Accordingly, for all of those reasons, the Court will deny Petitioner's ineffective assistance of counsel claim with regard to the forensic report.

B.     *Ineffective Assistance of Counsel for Failure to Properly Identify Factual and*
       *Legal Issues and Failure to Prepare and Secure Trial Evidence*

The Court will address Petitioner's next two claims as they fail for substantially the same reasons. Petitioner contends that Trial Counsel was ineffective for failing to properly identify factual and legal issues and for failing to prepare and secure trial evidence.

Under our jurisprudence, motions under § 2255 must allege sufficient factual detail to ground their claims. *See, e.g.*, *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000); *United States v. Dawson*, 857 F.2d 923, 928 (3d Cir. 1988) (holding that a claim without any elaboration was insufficient to create a genuine issue for review under § 2255). A movant "cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness based on vague and conclusory allegations." *Zettlemoyer*, 923 F.2d at 298–301. A court may dispose of "vague and conclusory allegations contained in a § 2255 [motion] . . .without further investigation." *Thomas*, 221 F.3d at 437 (citation omitted).

Here, Petitioner vaguely contends that Trial Counsel suffered from a "lack of preparation of vital evidence and lack of legal issues that remain in dispute," and "never devised a reasonable defense strategy to provide adversarial testing of the [Government's] case." (ECF No. 25, at 6).

For example, Petitioner contends that there were "vital business partnership agreements" and Trial Counsel had omitted "pages of contracts" that "would have easily impeached *all* Gov't witnesses." (ECF No. 25, at 10 (emphasis added)). Likewise, Petitioner concludes, without any further elaboration, that there were "17 . . . binders of impeaching and exculpatory evidence" and "3000 documents . . . left out of trial."[5] (*Id*. at 6, 10). Such allegations fail to identify *which*

---

[5] Even in his reply, Petitioner continues to present vague generalizations, alleging that Trial Counsel failed to review "7 boxes" and "6000" documents. (ECF No. 48, at 23, 25).

documents are at issue, *how* they impeach anyone, *who* Petitioner aims to impeach, or how they otherwise contain exculpatory information.

Similarly, apart from the Matheson Report and Mr. Ramsey's release form, Petitioner argues that Trial Counsel "failed to identify factual and legal issues that would dispute [the Government's] partial evidence at trial and at sentencing," without delineating those issues for the Government or the Court. (*Id.* at 6). Rather, Petitioner summarily concludes that Trial Counsel "did not understand any of the evidence prior to trial" and "never devised a reasonable defense strategy." (*Id.*).

Ultimately, these vague and conclusory allegations do not give any grounds for believing that Trial Counsel's actions were unreasonable or prejudicial to Petitioner's defense. Since Petitioner has not stated any *facts* that support these claims, they cannot survive summary dismissal.

Theoretically, the newly raised arguments in Petitioner's reply could fall under the ambiguous claims within the Instant Motion. Those claims are so vague, however, that it is more appropriate to consider the new and specific arguments in his reply, as distinct claims. Once again, the Court declines to consider the new claims first raised within Petitioner's reply. *See, e.g., Judge*, 119 F. Supp. 3d at 284 (holding that a petitioner "may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief.").

It "would be fundamentally unfair to the Government to permit Petitioner to provide the true bases for his claims after the Government has used its only opportunity to respond by answering [Petitioner's] barebones motion." *Gilbert*, 2016 WL 4087274, at *4 (citing *Judge*, 119 F. Supp. 3d at 284).

17

1.     Failure to Investigate a Document as to Ralph Ramsey

In the Instant Motion, apart from the Matheson Report, the only document that Petitioner refers to with any specificity, is a release form from Ralph Ramsey. (ECF No. 25, at 9). According to Petitioner, Trial Counsel failed to properly review and investigate this "release form 'signed' by . . . Ramsey who falsely testified . . . that he never signed this release which allowed [Petitioner] to release funds to advance a closing which was a legal transaction." (*Id*.). In Petitioner's view, this failure made "it impossible" to impeach Mr. Ramsey. (*Id*.).

By way of background, as part of their investment contract with Petitioner, Mr. Ramsey and Mr. Taylor invested $50,000 each, and their money was to be held in an escrow account. (Crim. No. 12-204, ECF No. 62, at 20–23). The funds "would be used to demonstrate to financial institutions that [Petitioner] had a certain amount of money in an escrow account." (*Id*.). Once Petitioner "obtained financing for the real estate project" at 1945 Glen Oak Drive, in Glenview, Illinois, the funds in escrow would be returned to Mr. Ramsey and Mr. Taylor, plus 25 percent in investor fees. (*Id*.).

After the time set forth in the contract came to pass, Mr. Ramsey painstakingly attempted to retrieve his money over the course of several months but was met with endless excuses. Petitioner also offered to transfer the funds over to a new project, and Mr. Ramsey rejected that offer. (*Id*. at 35–36). At some point during that morass, it appears that Petitioner induced Mr. Ramsey to sign a certain release which gave:

> Permission to release principal funds from the George Group's attorneys escrow account in the amount of $62,500.00 to Ralph Ramsey . . . by way or[sic] check or wire.

> Once the funds are sent to Ralph Ramsey, it is understood that Tate George & The George Group LLC will have paid you back the principal amount of $50,000 and interest of $12,500 satisfying the original terms of this transaction.

18

(ECF No. 1-1, at 7). Mr. Taylor signed a similar release.

Petitioner did not, however, wire the money to Mr. Ramsey. Eventually, Petitioner made a partial payment of $35,000.00 each to Mr. Ramsey and Mr. Taylor, but it was revealed that those funds came from other victims, rather than the funds which were to be held in escrow.

Mr. Ramsey and Mr. Taylor's funds were "received and spent in two months[,] all $100,000 from Ramsey and Taylor were gone, despite the fact that the contract provided that the money would be held in escrow." (Crim. No. 12-204, ECF No. 211, at 44). The funds were used largely "to support Mr. George and his life-style and his family, as well as over time . . . Ponzi-style payments." (*Id*. at 44–45). Mr. Ramsey and Mr. Taylor "were not the first investors with Mr. George. He had had sizeable investments prior to [them] . . . and he used the money of the victims to pay back prior investors." (*Id*. at 45).

With that background in mind, and despite an extensive review of the record and the trial transcripts, the Court is unable to ascertain the exact location of Mr. Ramsey's allegedly false testimony.

Petitioner failed to include any transcript citation as to when Mr. Ramsey testified that "he never signed this release." (ECF No. 25, at 9). In his reply, Petitioner contends that when Mr. Ramsey and Mr. Taylor were asked "whether or not they signed any releases and they both said 'No!'" (ECF No. 48, at 5). As to Mr. Taylor, this allegation is demonstrably false. Mr. Taylor testified that he did sign the release. (Crim. No. 12-204, ECF No. 62, at 105 ("Q. Did you sign this document? A. I did.")).

Petitioner may be referring to his claim that Mr. Ramsey agreed to permit Petitioner to use the funds for a different project, and that they modified their original agreement. (Crim. No 12- 204, ECF No. 62, at 57–59). Mr. Ramsey rejected those contentions, and judging from the

19

verdicts, the jury did so as well. (*Id.*). In any event, the plain language of the release did not allow Petitioner to do anything other than wire the money—that was supposed to be in escrow— back to Mr. Ramsey. (ECF No. 1-1, at 7).  Consequently, under the first prong of *Strickland*, Petitioner has failed to show that Trial Counsel's performance was deficient as to Mr. Ramsey's release form.

Alternatively, assuming *arguendo*, that counsel was somehow deficient as to the release, Petitioner fails to establish prejudice under *Strickland*. Even if Trial Counsel should have emphasized the release or some inconsistency regarding the release, Petitioner did not wire the money pursuant to that release. (ECF No. 1-1, at 7). Nor did Petitioner hold the funds in escrow pursuant to the contract with Mr. Ramsey. (Crim. No. 12-204, ECF No. 211, at 44).

In his reply, Petitioner appears to believe that this release "allowed [Ramsey's] and Taylor's investment to be released to Chudi," Petitioner's former business associate, and that "it was Chudi that stole their money." (ECF No. 48, at 6). By the terms of the release, however, it gave "[p]ermission to release principal funds from the . . . escrow account in the amount of $62,500.00 *to Ralph Ramsey* . . . by way or[sic] check or wire." (ECF No. 1-1, at 7 (emphasis added)).

Petitioner raised a similar argument at sentencing, and this Court is again "mystified" as to how Petitioner believes that this release allowed him to "roll" Mr. Ramsey's "money over into these new deals, which the trial victims had no idea about," or allowed Petitioner to transfer the funds in escrow to any other party. (Crim. No. 12-204, ECF No. 211, at 47, 131).

At any rate, the jury rejected those contentions. (Crim. No. 12-204, ECF No. 211, at 131– 32) ("That was the total opposite of what the trial victims testified to. They said that never happened. There were never any oral modifications to their agreements. So indeed, necessarily

implicit in the verdict of the jury is that the defendant lied on the stand.").

As the jury rejected Petitioner's underlying argument as to the release, and in light of the overwhelming evidence of Petitioner's guilt, Petitioner has failed to establish a reasonable probability that, but for counsel's error, the result of the trial would have been different. Accordingly, even if Trial Counsel were deficient in some way regarding Mr. Ramsey's release, Petitioner fails to establish prejudice under *Strickland*, and the Court will deny this claim.

C.      *Failure to Call or Investigate Various Witnesses*

Next, Petitioner's claim that Trial Counsel failed to call or interview certain *unspecified* witnesses, fails because it is vague and conclusory. Once again, motions under § 2255 must allege sufficient factual detail to ground their claim. *See, e.g.*, *Thomas*, 221 F.3d at 437; *Dawson*, 857 F.2d at 928. Petitioner "cannot meet his burden . . . based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense." *Zettlemoyer*, 923 F.2d at 298. Rather, Petitioner must set forth facts, and not merely conclusions, to support his contentions. *Id.*

In the Instant Motion, Petitioner vaguely alleges that counsel was ineffective for "lack of full investigation of defense witnesses and Gov't witnesses prior to trial." (ECF No. 25, at 10). Petitioner appears to be referring to a large number of witnesses, but does not identify any witnesses, except Mr. Ramsey. As a result, the Instant Motion fails to provide any grounds for believing that the failure to call or investigate these unspecified witnesses was either unreasonable or prejudicial to Petitioner's defense. Accordingly, the Court will summarily dismiss the claims as to the unspecified witnesses.

Although not necessary to the Court's disposition, in his reply, Petitioner specifically identifies one witness in support of this argument, Charles Houlihan, and alleges that Mr.

Houlihan had exculpatory information or might otherwise have taken the blame for Petitioner at trial. (ECF No. 48, at 22). Additionally, Petitioner contends that his civil attorney, Sean Mack, had a post-trial conversation with Mr. Ramsey, in which Mr. Ramsey stated "I did sign a release . . . that allowed his and Taylor's investment to be released to" Mr. Chudi, and that "it was Chudi that stole their money. . . . If I help George now—does that mean I will go to jail for lying at George's trial per the Government's instructions?" According to Petitioner, Mr. Mack is willing to testify to this admission.

Assuming *arguendo*, that Petitioner had identified Mr. Houlihan, Mr. Mack, and Mr. Ramsey's exculpatory admission in the Instant Motion, the Court would deny these claims because Petitioner "has not sufficiently asserted prejudice." *E.g.*, *Tolentino*, 2014 WL 3844807, at *3.

The Third Circuit has held that failure "to present any sworn testimony" from a proposed witness "amount[s] to a failure to establish *Strickland* prejudice." *See, e.g.*, *Baker v. United States*, No. 14-370, 2019 WL 6888537, at *11 (D.N.J. Dec. 18, 2019) (citing *Duncan*, 256 F.3d at 202). Courts in our District "have similarly found that a petitioner needs to provide a sworn statement of fact from the proposed witness regarding what they would have testified to if a § 2255 petitioner is to establish Strickland prejudice." *Id.*; *see, e.g.*, *Karamanos v. United States*, No. 04-0171, 2005 WL 2777552, at *4 (D.N.J. Oct. 24, 2005).

Demonstrating prejudice "requires more than just a 'conceivable' likelihood of a different result." *Grant v. Lockett*, 709 F.3d 224, 235 (3d Cir. 2013). Where a petitioner's claim rests on a "failure to call a witness, he cannot merely speculate as to how the witness would have testified at trial." *Gilliard v. Johnson*, No. 16-2188, 2019 WL 522069, at *11 (D.N.J. Feb. 11, 2019).

In this case, Petitioner fails to include any type of *sworn* statement from Mr. Houlihan,

Mr. Ramsey, and Mr. Mack, "regarding what [their] testimony would have been at trial had

[they] been properly called." *Baker*, 2019 WL 6888537, at \*11. In turn, even if Petitioner had

properly raised claims as to these witnesses, his failures to include sworn statements are "fatal to

his making [a] *prima facie* showing of prejudice" under *Strickland*. *See, e.g.*, *Tolentino*, 2014

WL 3844807, at \*3 (citing *Duncan*, 256 F.3d at 201–02).

Accordingly, the Court would alternatively deny the claims as to Mr. Houlihan, Mr.

Mack, and Mr. Ramsey's exculpatory admission, for failure to sufficiently assert prejudice. *See

e.g.*, *Karamanos*, 2005 WL 2777552 \*4 (rejecting ineffective assistance of counsel claim without

an evidentiary hearing for failure to provide sworn statements); *see also Tolentino*, 2014 WL

3844807, at \*3 (same).

## IV.     Re-litigating Claims Heard on Direct Appeal

Next, broadly construing the Instant Motion, it appears that Petitioner seeks to pursue

claims[6] that were brought and decided on direct appeal. In particular, Petitioner argues: (1) that

the Court improperly applied two sentencing enhancements; (2) that the Government violated

*Brady* by providing unreadable disks; and (3) that the Government suborned numerous perjuries.

A petitioner may not, however, use a § 2255 motion "to relitigate questions which were

raised and considered on direct appeal." *E.g.*, *United States v. DeRewal*, 10 F.3d 100, 105 n. 4

(3d Cir. 1993) (internal quotation marks omitted); *see also United States v. Travillion*, 759 F.3d

281, 288 (3d Cir. 2014) ("issues resolved in a prior direct appeal will not be reviewed again by

way of § 2255 motion").

---

[6] Arguably, these claims are also improper as Petitioner raised them for the first time in his reply
brief. Petitioner only *named* these claims as part of his appellate history within the Instant
Motion and did not elaborate upon them until his reply.

With those principles in mind, the Third Circuit explicitly rejected Petitioner's sentencing enhancement claims. As to the 2-level enhancement for perjury, the Third Circuit held that the "enhancement for perjury was proper because [Petitioner] testified falsely at trial." *George*, 684 F. App'x at 227. The Third Circuit concluded that Petitioner made material misrepresentations, "with respect to his authority to use investors' money," some of which were "irreconcilably . . . at odds with what the jury necessarily found in the verdicts." *Id.* (quoting (Crim. No. 12-204, ECF No. 212, at 28–29)) ("Because the District Court was bound to accept the facts necessarily implicit in the verdict, it properly found that George lied when he testified contrary to those facts." (internal quotation marks omitted)).

Next, the Third Circuit rejected Petitioner's claim that his 20-level enhancement for victim hardship and financial loss was unsupported by the evidence. *Id.* at 228 ("We also conclude that the enhancement for the financial loss of his victims was appropriate."). To the extent Petitioner bases his arguments on the Matheson Report, the Third Circuit held that "his unreliable sentencing report . . . cannot overcome the District Court's detailed findings with respect to the loss and the financial hardship that befell his victims." *Id.*

As to the claim that the Government violated *Brady* by providing unreadable disks, the Third Circuit held that "the factual premises of his *Brady* argument—that the evidence was unreadable and exculpatory—are also fallacious." *Id.* at 226. The Third Circuit found that this Court properly "rejected the idea that the disks were unreadable." *Id.* ("One of George's former attorneys had the passwords for his bank records, and the Government 'never blocked any evidence [or] failed to live up to its discovery obligations [ ] in a timely manner.'" (citation omitted)).

At any rate, the Third Circuit concluded that "[n]ot only did the information on the disks consist of George's own bank accounts (to which he had access), they too were used to prove his guilt, so they did not constitute *Brady* material." *Id.*

Finally, Petitioner argued on direct appeal that the Government "introduced false evidence," and that it produced "egregious perjury by all government witnesses." (Pet. App. Br., at 4, 10). According to Petitioner, "FBI Agent Bradley testified at sentencing that the Government did not conduct 'a formal investigation of any' of George's 'books, records, or bank accounts,' which meant that the financial evidence offered against him at trial, including the charts depicting his bank activity, must have been 'falsely contrived,'" and were not credible. *George*, 684 F. App'x at 226 (quoting Pet. App. Br., at 7).

Additionally, in Petitioner's view, certain victims, such as Mr. Mellinger, Mr. Ramsey, and Mr. Taylor, "testified that they did not sign 'releases' for the return of their investments . . . [but] the government, at sentencing, introduced contradictory evidence that they did sign 'releases.'" (Pet. App. Br., at 4).

The Third Circuit held that this Court properly rejected those arguments and that the decisions to do so were "not clearly erroneous." *George*, 684 F. App'x at 226. The Third Circuit concluded that Petitioner "mischaracterize[d] Agent Bradley's testimony" and that Petitioner "erroneously claim[ed] that Bradley 'admitted on the witness stand that there had been no governmental investigation of any bank statements pertaining to [the supposed development] projects at the time of trial.'" *Id.* (quoting Pet. App. Br., at 7) (second alteration in original). As to the other alleged perjuries, the Third Circuit found that this "Court did not clearly err when it found no perjury." *Id.* at 227–28 ("We have considered George's other miscellaneous arguments and find them to be without merit.").

25

Because the Third Circuit considered and rejected these arguments on direct appeal, Petitioner "cannot use [them] now to collaterally attack his conviction." *See, e.g.*, *Langforddavis v. United States*, No. 13-2921, 2016 WL 4544338, at *9 (D.N.J. Aug. 30, 2016). Accordingly, the Court will not reconsider these claims and will deny habeas relief on these three grounds.

## V.    Miscellaneous Motions

As Petitioner has no remaining claims, the Court will deny as moot his three motions to expedite. (ECF Nos. 40, 59, 64).  The Court will deny Petitioner's motion for an evidentiary hearing, (ECF No. 47), for failure to sufficiently allege prejudice under any of his claims. *See, e.g.*, *Karamanos*, 2005 WL 2777552 *4 (denying habeas relief without an evidentiary hearing after petitioner failed to make a *prima facie* showing of prejudice under *Strickland*); *see also Tolentino*, 2014 WL 3844807, at *3 (same).

As for Petitioner's motion to amend, (ECF No. 54), this Court may deny a motion "to amend where there is undue delay, bad faith, prejudice to the opposing party, or amending the pleading would be futile." *See, e.g.*, *Stavitski v. Safeguard Properties Mgmt., LLC*, No. 17-2033, 2018 WL 501646, at *2 (D.N.J. Jan. 22, 2018) (citing *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000)).

In his motion to amend, Petitioner again seeks to directly challenge his 20-level enhancement for victim hardship and financial loss and his 2-level enhancement for perjury, as well as the Government's alleged perjuries. (ECF No. 54, at 4–8). As discussed above, this Court will deny those claims because the Third Circuit heard and rejected those claims on direct appeal.

As a result, Petitioner's motion to amend is futile because he may not use a § 2255 motion "to relitigate questions which were raised and considered on direct appeal." *E.g.*,

*DeRewal*, 10 F.3d at 105 n. 4 (internal quotation marks omitted); *see also Travillion*, 759 F.3d at 288 ("issues resolved in a prior direct appeal will not be reviewed again by way of § 2255 motion"). Accordingly, the Court will deny Petitioner's motion to amend as futile.

## CERTIFICATE OF APPEALABILITY

A petitioner may not appeal from a final order in a § 2255 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Applying this standard, the Court finds that a certificate of appealability shall not issue in this case.

## CONCLUSION

For the reasons stated above, the Court will deny Petitioner's second amended motion to vacate, correct, or set aside his sentence under § 2255. (ECF No. 25). Additionally, the Court will deny as moot his three motions to expedite, (ECF Nos. 40, 59, 64), deny his motion for an evidentiary hearing, (ECF No. 47), and deny as futile his motion to amend (ECF No. 54). No certificate of appealability shall issue. An appropriate Order follows.


Date: <u>May 26, 2020</u>                                          */s/ Anne E. Thompson*
                                                                          ANNE E. THOMPSON, U.S.D.J.